**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 16-cv-03619 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| MARK CURRAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

During a lengthy period of pretrial detention at the Lake County Jail ("Jail"), Plaintiff Christopher Davis struggled with a range of mental health challenges. He especially struggled to sleep. Eventually, he was given a prescription medicine—Mirtazapine—that proved effective in treating his insomnia. But within a few months, Mirtazapine was removed from the list of approved available medications for Jail detainees. Although medical staff at the Jail provided Davis with alternative medications, he did not find any to be as effective as Mirtazapine. After filing internal grievances at the Jail, Davis initiated this lawsuit. The operative complaint alleges that Lake County ("County"), the Lake County Sheriff, and the Jail's Chief of Corrections (collectively, "County Defendants"), as well as Armor Correctional Health Services, Inc. ("Armor"), Dr. David Weis, and Matthis Guttierrez, Armor's site Health Services Administrator ("HSA"), violated Davis's Fourteenth Amendment right to adequate medical care in detention, asserting claims pursuant to 42 U.S.C. § 1983. Now, Defendant Guttierez and County Defendants have separately moved for summary judgment. (Dkt. Nos. 180, 184.) For the reasons that follow, both motions are granted.

## BACKGROUND

The following facts are drawn from the parties' submissions under Local Rule 56.1. They are undisputed unless otherwise noted.

### I. The Written Policies

A "formulary" is the list of medications available to be prescribed at a specific institution. (Pl.'s Resp. to Cnty. Defs.' Statement of Material Facts ("PRCDSOF") ¶ 12, Dkt. No. 193.) As of August 21, 2015, the Lake County Sheriff's Department maintained a written "Inmate Medications" policy. (Cnty. Defs.' Resp. to Pl.'s Statement of Additional Facts ("CDRPSAF") ¶ 1, Dkt. No. 198.) The policy dictated that, to manage pharmaceuticals, the Jail have both a formulary and a "formalized method for obtaining non-formulary medications." (Pl.'s Statement of Additional Facts ("PSAF") Ex. A, Inmate Medications Policy ¶ 28, Dkt. No. 195-1.) And at all relevant times Armor did have a process to petition its corporate pharmacist for approval of non-formulary medications. (PSAF ¶ 14, Dkt. No. 195.)

As of August 21, 2015, the Sheriff's Department also maintained a written "Medical Services" policy. (CDRPSAF ¶ 3.) The policy provided that an "inmate may file a complaint for any health care issue or to contest any charges for medical service by utilizing the inmate grievance system." (*Id.* ¶ 4.) In addition, the contract between Lake County and Armor, its healthcare provider, stated that:

> Inmate complaints or grievances regarding services under this Agreement shall be forwarded to Armor's site Health Services Administrator who shall promptly review the complaint or grievance, gather all information concerning the complaint or grievance, discuss such with Lake County's appointee and take appropriate action in accordance with Lake County's inmate grievance procedures.

(PSAF Ex. C, Inmate Health Care Services Agreement 14, Dkt. No. 195-3.)

## II. Davis's Detention and Care

Davis was admitted to the Jail in August 2009, was released, and then returned to the Jail in January 2010 on a new charge. (PRCDSOF ¶¶ 1–2.) For the most part, Davis was held continuously at the Jail from January 2010 until he was sentenced in March 2017. (*Id.* ¶ 3.) However, on three separate occasions during that time, he was sent to Chester Mental Health Center ("Chester"). (*Id.*) Davis was first sent to Chester in December 2011 after a court found him unfit to stand trial. (*Id.* ¶ 4.) He returned to Chester in September 2012 and in May 2016. (*Id.* ¶¶ 6–7.)

On June 13, 2015, Davis saw Dr. Maria Gunaratnam, a psychiatrist employed by the Jail's prior healthcare provider, Wexford Health Sources, Inc. ("Wexford"). (*Id.* ¶ 16.) Dr. Gunaratnam diagnosed Davis with "adjustment disorder with anxiety and insomnia." (*Id.* ¶ 17.) That same day, Dr. Gunaratnam prescribed Mirtazapine (also known as Remeron), an antidepressant, for Davis. (*Id.* ¶ 18.) Although an antidepressant, the prescription was to treat insomnia and anxiety. (*Id.* ¶ 9.) While his medical records show that he occasionally refused Mirtazapine, Davis was on the medication from June 13, 2015, through August 21, 2015. (*Id.* ¶¶ 11, 19.) Davis felt that Mirtazapine was effective in treating his symptoms, in turn helping him have fewer behavioral issues. (CDRPSAF ¶¶ 13, 19–20.)

Shortly after Davis was prescribed Mirtazapine, the Jail changed medical providers from Wexford to Armor. (PRCDSOF ¶ 15.) Corresponding with that change, the formulary used by medical staff at the Jail also changed. (*Id.* ¶ 14.) Mirtazapine was not included in the new formulary, making it a "non-formulary medication." (*Id.*) Accordingly, Davis received his last dose of Mirtazapine on August 21, 2015. (*Id.* ¶ 19.) Thereafter, Dr. Weis discontinued his prescription. (*Id.* ¶ 14.)

Three days later, on August 24, 2015, Davis was prescribed Hydroxyzine, an antihistamine, to help him sleep. (*Id.* ¶ 20.) On August 29, 2015, Dr. Weis noted that Davis was upset after learning that the medicine he had been getting to treat his insomnia (Mirtazapine) was no longer available at the Jail. (PRCDSOF ¶ 23; Cnty. Defs.' Statement of Material Facts ("CDSOF") Ex. 2, Pl.'s Medical Records 4, Dkt. No. 186.) Dr. Weis offered Davis medication adjustments to address his insomnia, namely, beginning Paxil, an antidepressant, and increasing Davis's dose of Hydroxyzine. (CDSOF Ex. 2, Pl.'s Medical Records 4.) Davis agreed to try these adjustments. (*Id.*) That day, August 29, 2015, Davis was prescribed Paxil. (PRCDSOF ¶ 24.) Later, on October 17, 2015, Dr. Weis prescribed Citalopram, another antidepressant, to treat Davis. (*Id.* ¶ 26.) Dr. Gunaratnam testified that Hydroxyzine, Paxil, and Citalopram are all medications she prescribes to treat insomnia. (*Id.* ¶¶ 21–22, 25, 27.)

Davis did not find Hydroxyzine to be effective in treating his insomnia and filed two grievances on August 29, 2015. (Pl.'s Resp. to Guttierez's Statement of Material Facts ("PRGSOF") ¶ 8, Dkt. No. 194; Guttierez's Statement of Material Facts ("GSOF") Ex. C, Consolidated Grievances, Dkt. No. 182-3.) Both grievances raise complaints about the discontinuation of Davis's Mirtazapine prescription and describe conversations he had with nursing staff and Dr. Weis about his treatment. (GSOF Ex. C, Consolidated Grievances.)

Under the contract between the Jail and Armor, inmate grievances regarding medical services were to be forwarded to Armor's site HSA. (PSAF Ex. C, Inmate Health Care Services Agreement 14.) On the date of Davis's grievances, Guttierez was the site HSA. (PRGSOF ¶ 9.) The parties dispute the limits of Guttierez's specific role and job duties. (*Id.* ¶ 10.) But it is undisputed that Guttierez had no authority to prescribe medications or otherwise to override the professional judgment of Armor's physicians. (*Id.* ¶ 12.)

Guttierez received and responded to Davis's grievances. (*Id.* ¶ 13.) In doing so, he reviewed the grievances and Davis's medical chart, and he personally met with Davis to better understand the issues raised. (*Id.* ¶ 14.) In that meeting, Guttierez advised Davis that treatment and medication determinations were up to Dr. Weis. (*Id.* ¶ 15.) Guttierrez also told Davis that he was not a doctor and had no ability to prescribe medications for him. (*Id.*) Guttierrez raised Davis's grievances about no longer receiving Mirtazapine to both Dr. Weis and the Jail. (*Id.* ¶ 16.) After Davis filed his grievances, he was seen several times by Dr. Weis, as well as by other mental health professionals. (*Id.* ¶ 18.)

On September 21, 2015, Davis appealed the response to his grievances. (CDRPSAF ¶ 15.) On October 6, 2015, Lake County Sheriff's Deputy Chief Uchiek responded to the appeal in writing. (*Id.* ¶ 16.) The response marked the grievances as "Unable to Resolve" and explained to Davis that "Medical is aware of your medical need and they are treating you. Please follow the doctor's orders." (GSOF Ex. C, Consolidated Grievances.)

**III. Davis's Medical Expert**

In connection with this litigation, Davis retained psychiatry specialist Dr. David G. Bawden as an expert witness. (CDRPSAF ¶ 27.) During Dr. Bawden's deposition, he offered various, at times critical, opinions regarding Davis's treatment at the Jail. (*Id.*) For their part, Defendants assert that Dr. Bawden's opinions do not have a sufficient factual basis. (*Id.*) Moreover, the parties dispute the implications of Dr. Bawden's testimony.

In his deposition, Dr. Bawden opined that, when Davis was taking Mirtazapine, "he was sleeping better, and other psychiatric symptoms had decreased, and he liked it." (GSOF Ex. A, Bawden Dep. 31:16–21, Dkt. No. 182-1.) Dr. Bawden stated that, in his opinion, Dr. Weis should have found a way to get non-formulary medication and put Davis back on Mirtazapine in

response to Davis's grievances because the substitute medication (Hydroxyzine) was not effective. (*Id.* 47:5–19.) Dr. Bawden acknowledged that there are multiple anti-psychotic medications that are sometimes used for sleep. (*Id.* 49:9–14.) And he observed that Hydroxyzine is sometimes used for sleep. (*Id.* 78:22–78:4.) But then he pointed out that he thought it unlikely that any psychiatrist would attempt to replace Mirtazapine, which was effective for Davis, with something like Hydroxyzine. (*Id.* 49:14–19.) Dr. Bawden explained that Mirtazapine and Hydroxyzine "are radically different drugs" with respect to how powerful each is in treating disorders like Davis's insomnia. (*Id.* 78:16–20.)

* * *

The Second Amended Complaint ("SAC"), now the operative complaint, alleges that Defendants Lake County, Armor, the Lake County Sheriff and the Jail Chief of Corrections, in their official capacities, and Dr. Weis and Guttierez, in their individual and official capacities, violated Davis's Fourteenth Amendment right to necessary medical care. The SAC also asserts claims against the County and Armor based on a theory of municipal liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Each Fourteenth Amendment claim is brought pursuant to § 1983. Guttierez and County Defendants have moved for summary judgment on the claims against them.

**DISCUSSION**

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Material facts are those that might affect the outcome of the suit, and a genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must construe the "evidence and all reasonable inferences in favor of" the non-moving party. *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). However, the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (internal quotation marks omitted). Bare assertions by the non-moving party that an issue of fact exists are not enough to create a genuine factual dispute. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000). When the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial," a court must grant summary judgment. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986).

## I. Fourteenth Amendment Inadequate Medical Care Standard

Because pretrial detainees are not yet subject to punishment, claims regarding their medical care arise under the Fourteenth Amendment, not the Eighth Amendment. *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022). In the past, courts in this Circuit evaluated Fourteenth Amendment claims using the same standard as that applied to claims arising under the Eighth Amendment. *Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005). However, in *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018), the Seventh Circuit held "that a standard of objective reasonableness, and not deliberate indifference, governs claims under the Fourteenth Amendment's Due Process Clause for inadequate medical care provided to pretrial detainees." *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018).

Assessing objective reasonableness involves a two-step inquiry. *Id.* "The first step, which focuses on the intentionality of the individual defendant's conduct, remains unchanged and asks

whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case." *Id.* (internal quotation marks omitted). Negligence, even gross negligence, is not enough. *Id.* With respect to Davis, this the analysis at this first step is straightforward, as no individual Defendant denies acting purposefully.

At the second step, courts "ask whether the challenged conduct was objectively reasonable." *Id.* A pretrial detainee "need not also demonstrate, as the Eighth Amendment requires, that the defendant was ***subjectively*** aware that his conduct was unreasonable." *McGee*, 55 F.4th at 569. Courts instead "focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and . . . gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *McCann*, 909 F.3d at 886.

**II. Defendants' Conduct**

Defendants raise a range of distinct arguments for summary judgment. However, this case ultimately boils down to a straightforward question: whether denying Davis his specific medication of choice, Mirtazapine, was an objectively unreasonable course of action by Jail officials. The caselaw on this question is clear. It was not.

To begin, Guttierez briefly contends that insomnia is not, on its own, a serious medical condition. However, it is unnecessary to dwell on that contention. Instead, the Court assumes for present purposes that Davis's insomnia is an objectively serious medical condition and turns to the dispositive question: whether anyone at the Jail made objectively unreasonable treatment decisions in addressing his condition.[1]

[1] The Court notes that there is considerable evidence in the record showing that Davis suffered from several psychological conditions in combination with his insomnia. Notably, Dr. Gunaratnam diagnosed

"[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").[2] That said, an inmate "is entitled to reasonable measures to meet a substantial risk of serious harm." *Arnett*, 658 F.3d at 754. Here, the undisputed facts show that those tasked with caring for Davis took reasonable measures to address his medical concerns. That Davis was no longer given Mirtazapine after August 22, 2015, is not enough to establish a constitutional violation.

Most of Davis's complaints, including those concerns identified in his grievances, concerned the short period of time from August 22 through August 29, 2015, when he was only being treated with Hydroxyzine. Davis did not find Hydroxyzine to be an effective replacement for Mirtazapine and he said as much—both directly to Dr. Weis and in his two grievances. Davis reported being irritable, anxious and unable to sleep at night. (CDRPSAF ¶ 22.) And Dr. Bawden, Davis's expert witness, vividly opined that, with respect to the power of the two drugs, Mirtazapine is to bourbon as Hydroxyzine is to soda pop. (GSOF Ex. A, Bawden Dep. 49:9–19.) The undisputed facts support Davis's contention that Hydroxyzine was less effective than Mirtazapine had been for him.

---

Davis with both anxiety and insomnia. Those two conditions appear to be closely connected, and Davis's Mirtazapine prescription was intended to treat both conditions.

[2] Under either the Eighth Amendment or the Fourteenth Amendment, a defendant cannot be held liable if they responded reasonably in addressing a plaintiff's medical concerns. The main analytical difference between cases arising under the different amendments is the Eighth Amendment requirement to assess the defendant's state of mind. But many Eighth Amendment cases turn on the defendant's conduct, not their state of mind. Accordingly, cases addressing claims of inadequate access to medical care under the Eighth Amendment standard remain instructive in the Court's analysis of whether a defendant's conduct was objectively reasonable.

But even accepting that Hydroxyzine was less effective for Davis than Mirtazapine, there is no evidence to suggest that the decision to treat Davis with Hydroxyzine was anything other than "a treatment decision . . . based on professional judgment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). And there is no evidence that it was an unreasonable decision. As Dr. Gunaratnam testified, Hydroxyzine can be used to treat insomnia. Indeed, Dr. Bawden himself testified that, while he would not have used Hydroxyzine in this situation, he is aware that physicians sometimes use Hydroxyzine to treat sleep issues. Treating Davis with Hydroxyzine did not present an obvious risk. And it did not "depart[] so radically from accepted professional judgment, practice, or standards" *Id.* at 663 (internal quotation marks omitted).

There is also no evidence that Dr. Weis, or any Defendant, "persiste[d] in a course of treatment known to be ineffective." *Id.* The undisputed facts show the exact opposite. The Jail stopped providing Mirtazapine to Davis on August 22, 2025. Two days later, on August 24, 2025, he was given Hydroxyzine as an alternative medication to treat his insomnia. Viewing the evidence in the light most favorable to Davis, that medication was ineffective. But he was only on the ineffective medication for five days before he (1) filed grievances expressing his concerns and (2) was seen by Dr. Weis. Dr. Weis did not ignore those concerns or persist with the ineffective medication. Rather, he had a conversation with Davis, reached an agreement with Davis on a new approach to his treatment, and duly changed his treatment approach in response to Davis's concerns. Specifically, Dr. Weis prescribed Paxil, another alternative medication, and increased the prescribed dose of Hydroxyzine. Again, the evidence, including Dr. Gunaratnam's testimony, shows this to have been an objectively reasonable professional judgment by Dr. Weis. *See Pyles*, 771 F.3d at 412 (holding that a prisoner plaintiff could not prevail on his Eighth

Amendment claim where the plaintiff complained that his medications were not working and the treating doctor responded by prescribing new medications or changing the doses).

There is little evidence in the record addressing the effectiveness of the Paxil and Hydroxyzine combination. Dr. Bawden's testimony does not mention Davis's treatment with Paxil at all. Still, assuming that Davis did not find this treatment to be effective either, there is no evidence showing that those treating Davis persisted in an unreasonable, ineffective approach. Instead, the record shows that Davis continued to be seen by Dr. Weis and other mental health professionals after the August 29, 2015, appointment. And in October 2015, Davis was once again prescribed an alternative medication, Citalopram, to treat his symptoms. As with Paxil, Dr. Bawden's testimony never mentions Davis's treatment with Citalopram. But Dr. Gunaratnam testified that Citalopram was an alternative medication that she would also use for sleeplessness. The decision to switch Davis's medication was another instance of Dr. Weis exercising his professional medical judgment. And the evidence shows that it did not depart from accepted professional practice or standards. No contrary evidence establishes that the decision was unreasonable.

Davis repeatedly asserts that Defendants ignored the Inmate Medications policy, which provides that the Jail must have a "formalized method for obtaining non-formulary medications." (PSAF Ex. A, Inmate Medications Policy ¶ 28.) But this argument is difficult to square with the undisputed fact that Armor ***did*** have a process in place to petition its corporate pharmacist for non-formulary medication. (PSAF ¶ 14.) So, more accurately, Davis's complaint is not that the Jail lacked a policy, but that Defendants should have used that policy to get him Mirtazapine but chose not to do so.

As the Seventh Circuit has explained with respect to pain medication in a prison context, "the Eighth Amendment does not entitle incarcerated patients to their preferred pain medication, nor does it impose the unrealistic requirement that doctors keep patients completely pain-free." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (internal quotation marks and citations omitted). That principle is just as sound when it comes to sleep medication and to those in pretrial detention. And whether addressing pain or sleep, "[t]here are many reasons for doctors to tread carefully when prescribing strong . . . medications." *Id.* As Dr. Bawden acknowledged in his deposition, some sleep medications—he names Ambien and Ativan—are often considered inappropriate for a carceral environment because of their potential for abuse. (GSOF Ex. A, Bawden Dep. 48:6–15.)

Davis has not introduced any evidence showing why Mirtazapine was removed from the Jail's formulary when Armor became the Jail's medical provider. Although Davis implies that the removal was cost-related, he points to no evidence supporting that theory. Davis is not entitled to inferences "supported by only speculation or conjecture." *Grant*, 870 F.3d at 568 (internal quotation marks omitted). Similarly, he has not introduced any evidence explaining the process to petition for non-formulary medication or the criteria by which doctors decide whether non-formulary medication is necessary and appropriate. Thus, there is no evidentiary basis from which to conclude either that the process was flawed or that it was not followed when it should have been. Further, aside from the three alternative medications that were in fact prescribed to Davis, he has not offered any evidence showing what other potential alternative medications were in the Armor formulary.

In sum, Davis has adduced no evidence tending to show that his doctors needed to give up on trying alternative medications in favor of petitioning for the one specific non-formulary

medication that Davis preferred. While Davis may have disagreed with Dr. Weis's decision, that decision was not objectively unreasonable. *See Vanderveer v. Fields*, No. 25-CV-481, 2026 WL 2719995, at *8 (E.D. Wis. Sept. 15, 2026) (holding that defendant doctor was not deliberately indifferent where she discontinued a non-formulary medication, prescribed alternative medications, and changed treatment approach when patient continued to complain the initial alternative was not working). Because Dr. Weis and the medical staff reasonably responded to Davis's concerns, they did not violate his Fourteenth Amendment rights.

Moreover, even if there were evidence in the record from which a reasonable jury could conclude that someone at the Jail should have gotten Mirtazapine for Davis through the non-formulary medication process, there is no evidence that Guttierez had either the authority or the responsibility to do so. "A defendant cannot be liable under § 1983 'if the remedial step was not within [his] power.'" *Id.* (quoting *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012)). And Guttierez has submitted a sworn declaration stating that he had no role or authority with respect to the Jail formulary, had no responsibility to oversee Armor's policies or protocols, and did not provide direct care to inmates. (PRGSOF ¶ 11.) He further asserts that his role was "purely administrative and limited to reviewing and responding to grievances." (*Id.*) More specifically, Guttierez states that he had no control over, and played no part in decisions related to, the availability of Mirtazapine at the Jail. (*Id.* ¶ 17.)

Davis does not offer any evidence to controvert the statements in Guttierez's declaration. Instead, he repeatedly refers to the portion of the contract between Armor and the County stating that, in response to medical grievances, the HSA shall "take appropriate action in accordance with Lake County's inmate grievance procedures." (PSAF Ex. C, Inmate Health Care Services Agreement 14.) Davis seeks to give the "appropriate action" language in the contract a much

broader meaning than is supported by either evidence or common sense. Guttierez reviewed Davis's grievances, discussed Davis's concerns with him directly, and shared the grievances with Dr. Weis and others at the Jail. That is appropriate action under the grievance procedures. Nothing other than Davis's say-so suggests that more was required of Guttierez or was within the powers of his role. As a result, the uncontroverted evidence shows that Guttierez, an administrator, not a physician, lacked the authority to make Mirtazapine available. Indeed, the Jail's Inmate Medication policy specifies that "[t]he ***jail doctor*** will approve all additions, deletions and substitutions for medications listed in the inventory." (PSAF Ex. A, Inmate Medications Policy ¶ 4 (emphasis added).) That Guttierez lacked independent authority to get Mirtazapine but communicated Davis's grievance to Dr. Weis, who did have authority over treatment decisions, supports that his actions were objectively reasonable.

Likewise, Davis does not provide any evidence establishing that Deputy Chief Uchiek had the authority to get Mirtazapine for Davis. Again, Uchiek was an administrator at the Jail, not a doctor. He was not personally involved in Davis's care. And Davis has not adduced any evidence that he had the authority to petition for non-formulary medications. All that the record shows is that Uchiek, like Guttierez, played a role in the grievance process at the Jail. And in addressing grievances, both Uchiek and Guttierez were "entitled to defer to the judgment of jail health professionals so long as [they] did not ignore" Davis. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). Indeed "the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so." *Id.* There is no dispute that Uchiek responded to Davis's grievance appeal. The information in the response is corroborated by the medical records showing Davis was receiving treatment. And there is no

evidence showing that Uchiek (or Guttierez) had reason to know that Davis's treatment was inadequate. *See McGee*, 55 F.4th at 569 (noting that the only exception to the general rule of deferring to medical staff is where the defendant has reason to know the inmate is receiving inadequate treatment). As with Dr. Weis and Guttierez, Uchiek did not ignore Davis's concerns and his actions were objectively reasonable.

### III. *Monell* Claims

Davis also seeks to hold Armor and the County liable for the allegedly inadequate treatment he received at the Jail. *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (municipality liability); *Glisson v. Ind, Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (private corporate liability for entities providing essential public services). But his claim suffers from two fundamental deficiencies. First, as discussed above, there is no evidence of an underlying constitutional violation by any individual Defendant. *See Pyles*, 771 F.3d at 412 ("[Prison healthcare provider] cannot be held liable for damages because there is no underlying constitutional violation."). Second, there is no evidence that any institutional policy of either the County or Armor caused a violation. *See Johnson v. Prentice*, 29 F.4th 895, 905 (7th Cir. 2022) (describing identical deficiencies in a *Monell* claim).

While Davis offers minimal argument and provides no evidence about a relevant policy or practice, he argues that Uchiek should be treated as a *de facto* policymaker at the Jail. *See Glisson*, 849 F.3d at 379 (explaining that *Monell* liability can be established by showing that a policy is made by someone whose acts can fairly be said to represent official government policy). Once again, however, Davis has not offered sufficient evidence to support that inference. For example, Davis has not provided evidence showing that Uchiek had final say with respect to medical issues at the Jail or that his decisions were not reviewed by his superiors. *Cf. Kujawski v.*

*Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 739 (7th Cir. 1999) (providing examples of evidence sufficient to create a genuine issue of fact on the question of whether there has been a delegation of policymaking authority). As noted above, Davis has provided no evidence that Uchiek had ***any*** authority over medical treatment, much less policymaking authority. As a result, there is no basis to conclude that he was a *de facto* policymaker at the Jail. Because there is no underlying constitutional violation and because Davis has not identified a policy, practice, or custom that might have caused the alleged violation, neither County Defendants nor Armor can be liable under the *Monell* doctrine.

**CONCLUSION**

For the above reasons, Davis has failed to put forward sufficient evidence to create a genuine dispute as to any material fact. Accordingly, Guttierez and County Defendants are all entitled to judgment as a matter of law. Defendant Matthis Guttierez's motion for summary judgment (Dkt. No. 180) and Defendants David Wathen, Lake County Sheriff Mark Curran, and Lake County's motion for summary judgment (Dkt. No. 184) are therefore granted.

ENTERED:

Dated: September 29, 2026

Andrea R. Wood
United States District Judge